**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JOHN H. RYS,                          ) Case No. CV 16-8391-JPR
                                      )
                    Plaintiff,        )
                                      ) **MEMORANDUM DECISION AND ORDER**
          v.                          ) **AFFIRMING COMMISSIONER**
                                      )
NANCY A. BERRYHILL, Acting            )
Commissioner of Social                )
Security,[1]                          )
                                      )
                    Defendant.        )
_____  )

**I.    PROCEEDINGS**

    Plaintiff seeks review of the Commissioner's final decision denying his application for Social Security disability insurance benefits ("DIB").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).  The matter is before the Court on the parties' Joint Stipulation, filed September 11, 2017, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed.

---

    [1] Nancy A. Berryhill is substituted in as the correct Defendant.  <u>See</u> Fed. R. Civ. P. 25(d).

1

## II. BACKGROUND

Plaintiff was born in 1952. (Administrative Record ("AR") 44, 148.) He has an associate's degree (AR 44, 227) and last worked as a credit analyst (see AR 58, 167).

In February 2013, Plaintiff filed an application for DIB, alleging that he had been disabled since May 26, 2011, because of "[m]ajor depression, anxiety, panic attacks, brittle diabetes," valvular heart disease, cholesterol, and hypertension. (AR 60-61, 78-79, 148-49.) After his application was denied initially (AR 98-102) and upon reconsideration (AR 105-09), he requested a hearing before an Administrative Law Judge (AR 111-12). A hearing was held on June 8, 2015, at which Plaintiff, who was represented by a nonattorney from a law firm (AR 43, 146), testified, as did a vocational expert. (AR 41-59.) In a written decision issued June 25, 2015, the ALJ found Plaintiff not disabled. (AR 26-40.) Plaintiff requested review and submitted additional medical evidence to the Appeals Council. (See AR 9-10, 982-1014.) On September 15, 2016, the council denied review, finding that the additional evidence related to a later period and did not provide a basis for changing the ALJ's decision. (AR 1-7.) The council ordered that the new evidence be made part of the administrative record. (AR 7.) This action followed.

## III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra

2

1  <u>v. Astrue</u>, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial

2  evidence means such evidence as a reasonable person might accept

3  as adequate to support a conclusion.  <u>Richardson</u>, 402 U.S. at

4  401; <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1035 (9th Cir. 2007).

5  It is more than a scintilla but less than a preponderance.

6  <u>Lingenfelter</u>, 504 F.3d at 1035 (citing <u>Robbins v. Soc. Sec.</u>

7  <u>Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether

8  substantial evidence supports a finding, the reviewing court

9  "must review the administrative record as a whole, weighing both

10  the evidence that supports and the evidence that detracts from

11  the Commissioner's conclusion."  <u>Reddick v. Chater</u>, 157 F.3d 715,

12  720 (9th Cir. 1998).  "If the evidence can reasonably support

13  either affirming or reversing," the reviewing court "may not

14  substitute its judgment" for the Commissioner's.  <u>Id.</u> at 720-21.

15  **IV.  THE EVALUATION OF DISABILITY**

16      People are "disabled" for purposes of receiving Social

17  Security benefits if they are unable to engage in any substantial

18  gainful activity owing to a physical or mental impairment that is

19  expected to result in death or has lasted, or is expected to

20  last, for a continuous period of at least 12 months.  42 U.S.C.

21  § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir.

22  1992).

23      A.   The Five-Step Evaluation Process

24      The ALJ follows a five-step sequential evaluation process to

25  assess whether a claimant is disabled.  20 C.F.R.

26  § 404.1520(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th

27  Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the

28  Commissioner must determine whether the claimant is currently

3

engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. § 404.1520(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, the claimant is not disabled and his claim must be denied. § 404.1520(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed. § 404.1520(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[2] to perform his past work; if so, he is not disabled and the claim must be denied. § 404.1520(a)(4)(iv). The claimant has the burden of proving he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id.

---

[2] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 404.1545; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). The Commissioner assesses the claimant's RFC between steps three and four. Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (citing § 416.920(a)(4)).

4

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy. § 404.1520(a)(4)(v); <u>Drouin</u>, 966 F.2d at 1257.  That determination comprises the fifth and final step in the sequential analysis.  § 404.1520(a)(4)(v); <u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

B.    <u>The ALJ's Application of the Five-Step Process</u>

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 26, 2011, the alleged disability-onset date.  (AR 28.)  At step two, she concluded that he had the following severe impairments: "a remote history of a cardiac stent placement and diabetes mellitus."  (<u>Id.</u>)  At step three, she found that he did not have an impairment or combination of impairments falling under a Listing.  (AR 32.)

At step four, the ALJ found that Plaintiff had the RFC to perform "the full range of light work."  (AR 32); see § 404.1567(b).  Based on the VE's testimony, the ALJ concluded that Plaintiff could perform his past relevant work as a credit analyst, as actually and generally performed.  (AR 35-36.)  Thus, the ALJ found Plaintiff not disabled.  (AR 36.)

**V.    DISCUSSION**

Plaintiff argues that the ALJ erred in (1) discounting the credibility of his subjective symptom statements (J. Stip. at 8-12) and (2) rejecting the VA "rating decision" deeming him partially disabled (<u>id.</u> at 4-6).  For the reasons discussed below, however, the ALJ did not err.

A. **The ALJ Properly Evaluated Plaintiff's Subjective Symptom Statements**

Plaintiff contends that the ALJ's "six rationales" for finding his claims not credible did not "even approach[] the law's stringent requirement that they be both clear and convincing." (J. Stip. at 8.) Those rationales, Plaintiff recounts, were his high GAF scores, medical-opinion evidence that his depression and anxiety were situational, indications that he failed to follow treatment recommendations, his collecting unemployment-insurance benefits after the alleged disability-onset date, his working after the alleged disability-onset date, and the inconsistency between his statements and his reported daily activities. (Id. at 8-12.) At least some of the ALJ's given reasons were clear and convincing.

1. **Applicable law**

An ALJ's assessment of the credibility of a claimant's allegations concerning the severity of his symptoms is entitled to "great weight." See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (as amended); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985) (as amended Feb. 24, 1986). "[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. See Lingenfelter, 504 F.3d

at 1035-36; see also SSR 96-7p, 1996 WL 374186 (July 2, 1996).[3] "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter, 504 F.3d at 1036. If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in original).

If the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if she makes specific findings that support the conclusion. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (as amended); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090,

---

[3] Social Security Ruling 16-3p, 2016 WL 1119029, effective March 16, 2016, rescinded SSR 96-7p, which provided the framework for assessing the credibility of a claimant's statements. SSR 16-3p was not in effect at the time of the ALJ's decision in this case, however, and therefore does not apply. Still, the Ninth Circuit has clarified that SSR 16-3p "makes clear what our precedent already required: that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms,' and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness." Trevizo v. Berrhill, 871 F.3d 664, 678 n.5 (9th Cir. 2017) (as amended) (alterations in original) (quoting SSR 16-3p).

7

1102 (9th Cir. 2014). The ALJ may consider, among other factors, (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties. Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015) (as amended); Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." Thomas, 278 F.3d at 959.

> 2. Relevant background

Plaintiff's medical records indicate that he has been seen by at least four doctors for mental-health issues: psychologist Nadine La Fleur (e.g., AR 226-30), telepsychiatrist[4] Young Mee Choi (e.g., AR 266-70), clinical psychologist Jaime Gonzalez (e.g., AR 237-44), and general psychiatrist Marlene M. Cordero (e.g., AR 978).

> a. *Dr. La Fleur*

Dr. La Fleur provided a disability evaluation of Plaintiff in December 2011. (AR 226-30.) The evaluation was conducted because Plaintiff was requesting an increase in his service-connected disability with the VA. (AR 226.) He reported that he could not work because of "his inability to get along with

---

[4] Telepsychiatry involves the use of videoconference technology to deliver psychiatric care. (See AR 266-67.)

people, loss of motivation, depressed moods and anxiety build-up." (Id.) He specifically noted that his unemployment was "due, primarily, to the effects of [his] mental condition because [his prior work] caused stress, anxiety, and loss of motivation." (AR 228.)

Plaintiff reported that his symptoms, which he described as "moderate" and "episodic," began in 2000, when he was diagnosed with a heart condition. (AR 226.) He stated that he also had "had trouble sleeping for 4 [years]" but that that condition was "currently being controlled by medication." (Id.) He took quetiapine[5] and sertraline[6] with "no side effects" and indicated that the four psychotherapy sessions he had attended over the past year were "not helpful." (Id.) He also reported substance abuse, "using alcohol 30 time(s) per month in the amount of 2 oz. of Scotch," and said the abuse started "because of pressure and stress" while he was in the military.[7] (AR 228.) He also reported having a "good relationship" with his wife of 29 years and "very good" relationships with his three sons. (AR 226-27.)

Upon examination, Dr. La Fleur noted that Plaintiff's orientation was "within normal limits"; his appearance, hygiene,

_____

[5] Quetiapine is an atypical antipsychotic used to treat the symptoms of schizophrenia, mania, and depression. Quetiapine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a698019.html (last updated July 15, 2017).

[6] Sertraline is an antidepressant used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety disorder. Sertraline, MedlinePlus, https://medlineplus.gov/druginfo/meds/a697048.html (last updated Apr. 15, 2017).

[7] Plaintiff was in the air force from 1970 to 1972. (See AR 227.)

behavior, and thought processes were "appropriate"; he was able

to understand directions; he did not have slowness of thought; he

did not appear confused; and his judgment and abstract thinking

were normal. (AR 228.) She found, however, that he demonstrated

"anxiety and depressed mood," lack of motivation, "easily

accelerated" irritability and anxiety, "impaired attention and/or

focus," and mildly impaired memory, forgetting "names,

directions, [and] recent events." (Id.) She assessed Plaintiff

with depressive disorder, anxiety disorder, alcohol abuse, and a

global assessment of functioning score of 65.[8] (AR 229.)

Moreover, she indicated that he had the following symptoms

---

[8] A GAF score of 61 to 70 indicates mild symptoms in one area or difficulty in social, occupational, or school functioning, but the person is generally functioning well, with some meaningful interpersonal relationships. See Diagnostic and Statistical Manual of Mental Disorders 32 (revised 4th ed. 2000). The Commissioner has declined to endorse GAF scores, Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50764-65 (Aug. 21, 2000) (codified at 20 C.F.R. pt. 404) (GAF score "does not have a direct correlation to the severity requirements in our mental disorders listings"), and the most recent edition of the DSM "dropped" the GAF scale, citing its lack of conceptual clarity and questionable psychological measurements in practice, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2012). Because GAF scores continue to be included in claimant medical records, however, the Social Security Administration has clarified that they are "medical opinion evidence under 20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2) if they come from an acceptable medical source." Wellington v. Berryhill, 878 F.3d 867, 871 n.1 (9th Cir. 2017) (citing Richard C. Ruskell, Social Security Disability Claims Handbook § 2:15 n.40 (2017)). As with other medical-opinion evidence, the reliability of a GAF score depends on whether it is "consistent with the other evidence, the rater's familiarity with the claimant, and the credentials of the rater"; GAF scores "should not be considered in isolation." Ruskell, supra, § 2:15 n.40 (citing internal Social Security Administrative Message number 13066, which became effective July 22, 2013, and was revised on Oct. 14, 2014).

associated with his diagnosis: "depressed mood, anxiety, mild memory loss[,] chronic sleep impairment, difficulty in establishing and maintaining effective work and social relationships[,] and difficulty in adapting to stressful circumstances." (Id.) He also had "occupational and social impairment with reduced reliability and productivity." (Id.) She found him "capable of managing benefit payments in his own best interest," lacking a "cognitive inability to do so." (Id.) She concluded that his "service-connected disabilities" — depressive disorder and anxiety along with coronary artery disease and diabetes mellitus — "render[ed] him, at least as likely as not, unable to maintain and secure substantially gainful employment." (AR 230.)[9]

>    b.   *Dr. Choi*

In February 2013, Dr. Choi provided a narrative report regarding Plaintiff's mental-health condition. (AR 341-42.) Dr. Choi diagnosed Plaintiff with depressive disorder, anxiety disorder, alcohol abuse, and marijuana abuse, among other conditions, and said he had a GAF score of "61-70." (AR 341.) He explained that he began seeing Plaintiff in 2007 and that his diagnoses were "established by psychiatric diagnostic interview, reassessments, chart review including medical, other mental health notes and laboratory findings, mental status examinations, and [Plaintiff's] self-reports." (Id.)

---

[9] The ALJ rejected Dr. La Fleur's opinion, finding it "of little probative weight due to its equivocation and due to the mild mental health findings upon examination that do not support any finding of disability." (AR 30.) Plaintiff has not challenged this aspect of the ALJ's decision on appeal.

Dr. Choi noted that Plaintiff's prognosis varied depending on "situational stressors," "the weather," "his diabetic control," and "substance abuse" and found that there were "no limits on his activities." (AR 342.) Dr. Choi stated that Plaintiff most recently reported, in December 2012, that he "was feeling better" because "his financial stress decreased with an increase in his VA Service Connection benefit" and that "he reported feeling stable" on his medications and "did not want to make changes despite his chronically low levels of energy and mood." (AR 341.) Plaintiff was also "not willing to make changes in his alcohol and marijuana use" and "was no longer planning to follow up in psychotherapy." (Id.)

Though Plaintiff apparently began seeing Dr. Choi in 2007 (id.), the earliest notes in the record indicate that he saw Dr. Choi in August 2009 for alcohol addiction and "psychological dependence" on marijuana (see AR 268-69). Plaintiff "refused referrals" and canceled follow-up appointments, not seeing Dr. Choi again until over a year later, in December 2010 and March 2011. (AR 269.) In the latter month, he was noted as not wanting "to stop either [alcohol or marijuana use] despite education." (Id.)

Plaintiff next saw Dr. Choi on May 26, 2011, by videoconference — also referred to as "telehealth" or "telepsychiatry" — and reported continued alcohol and marijuana abuse. (AR 266-70.) He stated that he drank "1.5 oz of liquor per night" and "3 oz" "once or twice a month." (AR 267.) He did not "sleep well" when he drank more, and at one point he was drinking "4 oz per night" but had to "cut back." (Id.) He also

used marijuana instead of alcohol "a couple of times a month" to help him sleep, "feel happy," and "escape." (Id.) He indicated that his life was "not so great" because he "work[ed] 50-60 hours a night."[10] (Id.) He also reported that his VA disability rating was recently increased to 70 percent, though "he was hoping [it would] be 100% so he [didn't] have to work and the 'stress of that [would be] gone.'" (Id.) Dr. Choi noted that Plaintiff maintained good eye contact, had good grooming, presented with no psychomotor disturbance, and had a "pleasant" affect. (AR 268.) His thought processes were "[l]inear" and "goal directed," and his mood was, as he reported, "okay." (Id.) He assessed Plaintiff with alcohol and marijuana abuse, depression, and anxiety and assigned him a GAF score of "61-70." (Id.) He advised Plaintiff to continue using sertraline and quetiapine. (Id.)

Plaintiff saw Dr. Choi again in October and November 2011. (AR 259-66.) In October, Plaintiff indicated that he was "laid off three months ago" and that he was "feeling a little better" without the stress of work. (AR 262.) He stated that he could not pay the mortgage, however, and reported some stress about possibly losing his house; he was "thinking of moving to Sacramento," where it was "cheaper" to live. (AR 262-63.) "Since being laid off," he stated, he was "less social outside of the house." (AR 263.) He also reported that he "cut back" on his alcohol consumption, having had "a couple of beers and 3-4 drinks in the last few months," and was smoking "one joint over a

---

[10] "Night" is presumably a scrivener's error for "week."

13

couple of weeks." (AR 262.) Dr. Choi noted that his thought processes were linear and goal directed, his affect was pleasant, and his mood was "okay." (AR 264.) He assessed him with a GAF score of "61-70." (Id.) In November, Dr. Choi made similar findings, assessing him with a GAF score of "61-70" (AR 260), and Plaintiff himself reported that he was doing "better" and was "thinking of applying for a federal job" (AR 259-60).

They met again in early 2012, with Plaintiff reporting in January that he had concerns about turning 60 years old. (AR 247-48.) He stated that he was using "up to 2 joints" of marijuana a week but that his alcohol use was "down to once or twice a month when he goes out." (AR 248.) He also stated that he was taking his medications and denied side effects. (Id.) Dr. Choi noted that his grooming was "[p]oorer than baseline," his energy was "low," and his affect was "constricted to pleasant." (AR 249.) He assessed a GAF score of "61-70" and noted that Plaintiff was "willing" to have a "new psychology consult." (AR 249-50.)

By February 2012, his symptoms were "less severe" and he was "more active" because of the "nicer weather." (AR 336.) He was "adherent with his meds," denied any side effects, and denied alcohol use. (Id.) His mood was "pleasant, nearly euthymic," and Dr. Choi assessed him with a GAF score of "61-70." (AR 337.) Dr. Choi noted that Plaintiff was improving, though he "subjectively . . . minimize[d] it"; Plaintiff agreed that his medications were a "good fit." (AR 338.) Dr. Choi encouraged "no [alcohol] or [marijuana]/illicit drugs." (AR 452.)

Plaintiff canceled their next appointment, in May 2012,

14

without rescheduling (AR 236, 318), and in June Dr. Choi received an incomplete request for medical-health information for one of Plaintiff's disability claims (AR 318). In July, Plaintiff met with Dr. Choi and said he would get back to him about the request. (AR 301.) He was "not working" and was just "waiting for decisions [regarding] his benefits." (Id.) He reported that he had a "panic attack" and "a bad day" when he turned 60, was drinking "about 1 oz [of] Scotch per day," and was using marijuana "3 days a week, one joint per week." (Id.) He also reported "frustration with sense of lack of improvement in therapy" and stated that he was "not ready to go to a group." (AR 302.) Dr. Choi discussed with Plaintiff his "good marriage, celebrating 30 years of marriage and enjoying that day," and Plaintiff described his relationship as "supportive of each other." (AR 301.) Dr. Choi noted that his irritability "improved with . . . glucose control" and that Plaintiff was "taking his medications daily/nightly" without side effects. (AR 302.) Dr. Choi assessed Plaintiff with a GAF score of "61-70" and found that he had good eye contact, linear and goal-directed thought processes, and an initially "low energy" and "sorrowful" affect that was "upbeat and cheerful" by the end of the session. (AR 303.) He "encouraged" Plaintiff to "decrease/stop" alcohol use and "advised against ongoing [marijuana] use." (AR 305.)

Plaintiff saw Dr. Choi again in September 2012 and reported "getting frustrated with disability" and wanting "a stronger medication for depression." (AR 295.) He stopped responding to his therapist's attempts to schedule follow-up appointments, and he reported drinking "about 1.5 ounce[s of alcohol] a day" and

stopping marijuana use "2 weeks ago" because of "expenses," as he
had been "going through 1 joint per three days." (Id.) He also
reported that he started going to "the pool with his dog to play
fetch every day" for an hour and that he "golfed twice in the
last 6 months." (Id.) Dr. Choi assessed Plaintiff with a GAF
score of "61-70" (AR 297) and encouraged him to "stop" alcohol
use and "advised against [marijuana] use" (AR 298).

By December 2012, Plaintiff continued to drink "a good ounce
a night" and smoke marijuana "about twice a week" (one joint
"last[ing] 1.5 to 2 weeks"), and he had still not followed up
with psychotherapy. (AR 284.) He reported that his VA
disability rating had increased to 90 percent and that he had
"applied for unemployability." (Id.) He stated that he was now
walking his dog "for a mile a day" for "about 30 minutes" and
felt "great," "good," and "nice"; he also stated that he was "not
willing to make changes" in his alcohol or marijuana use. (Id.)
Dr. Choi noted that Plaintiff was "stable on his current
medications" despite his "chronically . . . low levels of energy
and mood" and assessed him with a GAF score of "61-70." (AR
286.) He "again provided" education and encouragement to
Plaintiff regarding his alcohol and drug use. (AR 287.)

Plaintiff next saw Dr. Choi in April 2013, two months after
the doctor completed his disability narrative. (AR 386-87.)
Plaintiff reported drinking "1 to 1.5 oz of [alcohol] per day,"
not smoking marijuana since December 2012, and "doing more
household work." (AR 387.) He was taking his medications and
denied side effects. (Id.) Dr. Choi assessed him with a GAF
score of "61-70" (AR 388) and again "[r]einforced" having

16

"lower/no [alcohol]" (AR 389). Dr. Choi also reviewed his disability letter with Plaintiff, but Plaintiff stated that "another benefits psychiatrist ha[d] already written that he's permanently disabled." (AR 387.)

At their next meeting, in September 2013, Plaintiff reported being denied unemployment benefits and said that when that happened he "cancelled his appointments" (AR 648) and "his mood and health [got] worse" (AR 646). He also reported losing his home and said his son with "a drinking issue" was living with him and his wife. (Id.) Though he apparently "stayed on his psychiatric medications," he had "become non adherent on sertraline," was "not seeing anyone for therapy," and refused psychotherapy referrals. (AR 646, 649.) He reported, however, that he had "cut back" on his alcohol consumption, having "about 3 oz of whiskey a week," and that he had "enjoyed a visit back East," during which he felt "fantastic." (AR 646.) Dr. Choi noted Plaintiff's GAF score at "61-70" and again advised him to stop alcohol and drug use. (AR 648-49.) A few months later, Plaintiff canceled their next appointment, in January 2014. (AR 650.)

Plaintiff saw Dr. Choi again in March 2014. (AR 635-40.) He reported "frustration with trying to get his social security benefits" and stated that "[n]o matter what [he tried]" he couldn't "get through" to receive either Social Security or VA benefits. (AR 635.) Dr. Choi found that Plaintiff "missed about 3 months of sertraline" (AR 639), though he reported taking his medications (AR 635), and noted that he was "not attending psychotherapy and refused referral" because it would "only make

17

[him] worse to hear other people's problems" (AR 636). He stated that his alcohol consumption was "not that much" because his son, who was "out of work and living with them," was an alcoholic, and so they didn't "have alcohol in the house." (Id.) But he also reported that he was drinking "3 oz [of] whiskey per week" and having "1-2 [marijuana] joints per month." (Id.) Dr. Choi had Plaintiff agree to "medication adherence" (AR 639) and "again provided" "[e]ducation and abstinence reinforcement" regarding his alcohol and drug abuse (AR 640).

Plaintiff did not show for their next appointment, in May 2014. (AR 621.) When Dr. Choi called him that day, he stated that "he got his Social Security and no longer [was] depressed." (Id.) He was "doing 'much, much better' and wanted to move his app[ointment] further out." (Id.)

They met in June 2014, and Plaintiff again reported that "[a]s soon as the Social Security was approved, he instantly felt his mood improved." (AR 617.) He stated that he was gardening and that "gardening helped his mood even before he received his social security benefits." (Id.) Moreover, he was "working on Dutch furniture at home" and was "looking forward to traveling with his wife up and down the coast." (Id.) Dr. Choi noted that he was compliant with his medication, was using less marijuana ("1-2 joints per month"), and had "cut back" his drinking to "sneak[ing] in a few drinks a week" because of his "son's problem." (Id.) He appeared "relaxed and at ease" (AR 618), and his mood was "great," with "full, appropriate affect" (AR 619). Dr. Choi nonetheless provided education and a plan for his alcohol use, "even though [Plaintiff wouldn't] agree to

abstinence." (AR 621.)

Plaintiff did not see Dr. Choi again until January 2015. (AR 912-17.) He reported that he had recently received a 100 percent disability rating from the VA and was "doing great." (AR 912.) He was now just waiting to receive "total permanent disability," as he had received only "early retirement social security" before. (Id.) He "denie[d] depression or low mood for a long time" and reported taking his medications "every day" without side effects. (AR 913.) "[B]ecause of his son's situation" he had only "one drink in the last couple of months." (Id.) And he had only "one joint in the last couple of months," the last time being "a couple of weeks" prior, during a "long drive home from Reno." (Id.) He reported visiting two of his sons there before the holidays and had "enjoyed himself." (Id.) Dr. Choi noted that he appeared relaxed and at ease and was "[c]heerful." (AR 914.) Plaintiff indicated that he did not want to abstain from either alcohol or marijuana despite instructions to do so. (AR 913, 917.) Dr. Choi brought up a disability letter that had been requested by Plaintiff's attorney, but Plaintiff "requested that [Dr. Choi] not complete it." (AR 913; see also AR 649-50.)

Plaintiff last saw Dr. Choi in May 2015. (AR 1002-06.) He reported doing "fine" and was taking his medications "without issues." (AR 1002.) They discussed that Dr. Choi was leaving the VA. (AR 1005.) Dr. Choi noted their "good rapport" and said Plaintiff was "[c]heerful," with "full, appropriate affect." (AR 1004.) Though they reviewed his alcohol and marijuana use, Plaintiff "d[id] not agree to abstinence." (AR 1006.)

1          c.  *Dr. Gonzalez*

2     On referral from Dr. Choi, Plaintiff began seeing Dr.

3 Gonzalez for psychotherapy in January 2012.  (AR 237-44.)

4 Plaintiff stated that he felt depressed.  (AR 238.)  He had "low

5 mood," did not want to do anything, and did not want to go out

6 with friends or play golf anymore.  (Id.)  He reported losing his

7 last job in June 2011, and he discussed "collecting unemployment"

8 and recently applying for a 100-percent-disability determination

9 from the VA, which he was "hopeful" would go through and relieve

10 his "financial burdens."  (Id.)  His unemployment benefits would

11 run out, he stated, by the end of 2012.  (AR 239.)

12     He reported drinking one to two ounces of scotch a day and

13 said he last drank two months earlier.  (AR 238.)  He also

14 reported smoking marijuana three or four times a week.  (Id.)

15 Dr. Gonzalez noted that he was "not interested in quitting."  (AR

16 241.)  Plaintiff also said that he had a "good relationship" with

17 his brother and had "many friends, but none that he ha[d] engaged

18 in recently."  (AR 238-39.)  He was "not interested in group

19 therapy" and requested "1:1" supportive psychotherapy instead.

20 (AR 241.)  Dr. Gonzalez assessed him with depressive disorder,

21 anxiety disorder, and marijuana and alcohol abuse.  (AR 243.)  He

22 gave Plaintiff a GAF score of 59.[11]  (Id.)

23     They met twice in March 2012.  (AR 324-35.)  At their

24 earlier meeting, Plaintiff reported being "okay," though he was

25

26

27     [11]  A GAF score of 51 to 60 indicates moderate symptoms or
moderate difficulty in social, occupational, or school
functioning.  See Diagnostic and Statistical Manual of Mental

28 Disorders 32 (revised 4th ed. 2000).

"sad" the week before because "the weather was bad." (AR 334.)
They discussed the relationship between his activity level, mood,
and financial situation. (Id.) Plaintiff was not interested in
quitting marijuana, and Dr. Gonzalez noted that his eye contact,
speech, and language were "within normal limits" and his thought
processes and content were "normal." (Id.) Dr. Gonzalez
assessed him with a GAF score of 59. (Id.) At their next
meeting, Plaintiff again reported doing "okay," even though his
appeal for a "100% [service-connected]" disability rating from
the VA had recently been denied. (AR 324.) After discussing his
worries, Dr. Gonzalez assessed him with a GAF score of 59. (AR
325.)

Plaintiff was a "no-show" at the following appointment, in
April 2012 (AR 323); he was next seen in May and reported doing
"okay" (AR 322). They discussed Plaintiff's recent 60th
birthday, during which, he said, he had a panic attack, and Dr.
Gonzalez assessed him with a GAF score of 59. (Id.) His last
appointment with Dr. Gonzalez was in June 2012, and he reported
"increased stress, irritability and frustration" because many
things in his life were not going "right," including the denial
of his disability-increase request. (AR 312.) He refused group
therapy (id.) and was assessed a GAF score of 59 (AR 313).
Plaintiff informed Dr. Gonzalez that he was applying for DIB, and
Dr. Gonzalez stated that he would complete a disability form for
his attorneys. (AR 312-13.) Plaintiff apparently did not follow
up on the request and canceled their next appointment, in July
2012. (AR 313-14.) Dr. Gonzalez noted that he made "[s]everal
attempts to contact [Plaintiff]" but "to no avail." (AR 314.)

21

Plaintiff had "not returned any attempts at contact." (<u>Id.</u>)

d. *Dr. Cordero*

Dr. Cordero provided three opinions regarding Plaintiff's mental-health limitations. On May 26, 2015, less than a month before the ALJ's decision, she stated that Plaintiff was "unable to perform any occupation" and that he "suffer[ed] from a combination of major medical conditions which can be easily aggravated by the stress of work of any type." (AR 978.) On June 19, 2015, she completed a check-box form indicating that Plaintiff was "totally disabled without consideration of any past or present drug and/or alcohol use" and that "[d]rug and/or alcohol use [was] not . . . material" because Plaintiff's "use of drugs and/or alcohol [was] insignificant and ha[d] no impact on his disability." (AR 983.)

On October 20, 2015, nearly four months after the ALJ's decision, Dr. Cordero completed a check-box mental-impairment questionnaire in which she noted Plaintiff's diagnoses for "major depression disorder" and "post traumatic stress disorder." (AR 1010.) She assessed him with moderate-to-marked and marked limitations in understanding and memory, concentration and persistence, social interactions, and adaptation. (AR 1013.) He was only moderately limited in his ability to "[c]arry out simple, one-to-two step instructions." (<u>Id.</u>) In support of her assessment, she checked boxes for the following signs and symptoms: depressed mood, persistent or generalized anxiety, difficulty thinking or concentrating, easy distractibility, poor

memory, anhedonia,[12] decreased energy, retardation, social withdrawal or isolation, "flashbacks of combat experience," and "disrupted sleep, early awakening." (AR 1011.) She explained that Plaintiff had "difficulty thinking or concentrating[,] easy distractibility[,] immediate memory impairment[,] anhedonia[,] decreased energy[, and] anxiety." (AR 1012.) She also noted that in May 2011, Plaintiff "was fired due to poor performance: irritable, confrontational, agitated, too depressed, felt unable to do the tasks as he was easily frustrated and unable to concentrate." (Id.) Plaintiff, she stated, was prescribed sertraline and Seroquel[13] and had no side effects from those drugs. (AR 1010.)

Dr. Cordero noted that she had last examined Plaintiff five months earlier, on May 26, 2015, and first began seeing him in December 2012. (AR 1010, 1012.) The only other documentation in the record regarding Dr. Cordero's treatment of Plaintiff is from April 2013. (AR 231-33.) At that time, she noted that she had been treating him from October 2008 to December 2012, he had such diagnoses or symptoms as "severely depressed mood, difficulty falling [and] staying asleep, diminished concentration, diminished memory, anxiety, withdrawal, [and] anhedonia," and his

---

[12] Anhedonia is the absence of pleasure from the performance of acts that would ordinarily be pleasurable. Stedmans's Medical Dictionary 88 (27th ed. 2000).

[13] Seroquel is the name-brand version of quetiapine, an atypical antipsychotic used to treat the symptoms of schizophrenia, mania, and depression. Quetiapine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a698019.html (last updated July 15, 2017).

disability was "permanent." (AR 231-32.)[14]

### e. *Plaintiff's statements*

In his function report, Plaintiff stated that he was unable to work because of coronary artery disease, diabetes mellitus, a "severely depressed mood, difficulty falling and staying asleep, diminished concentration, diminished memory, anxiety, withdrawal, [and] anhedonia." (AR 173.) He reported problems with sleeping and personal care (AR 174-75); getting along with family, friends, neighbors, and others because of "too much depression, anxiety, [and] fear" (AR 178); concentrating and following instructions (id.); and getting along with "bosses" (AR 179). He indicated that he watched television and checked his email (AR 174), prepared his own meals daily (AR 175), and did the laundry (id.). He also stated that he would go outside "twice a day," could walk and drive a car, shopped for groceries "in stores," and could pay bills, count change, handle a savings account, and use a checkbook or money orders. (AR 176.) He did not spend time with others and when watching television would lose interest or concentration after an hour. (AR 177.)

At his June 2015 hearing, Plaintiff testified that he was unable to work because of his heart condition, anxiety, depression, and diabetes. (AR 45.) He indicated that he gardens "three or four pots on the deck" for about 15 to 20 minutes at a

---

[14] The ALJ rejected Dr. Cordero's opinions because the April 2013 medical record "did not include any significant narrative discussion . . . regarding mental health findings or the basis for [its] conclusions" and her May 2015 letter "failed to discuss objective findings to support [its] conclusion" (AR 31 (citing 343-46, 978-81), 35), findings Plaintiff has not challenged on appeal.

time and that he stopped walking because of pain in "two or three rotary cuffs on [his] right shoulder" and previously because he moved and lost his house. (AR 48-49.) He testified to drinking three ounces of alcohol a week. (AR 50.) And despite consistently denying side effects from his medications throughout the relevant period (see AR 267 (May 2011), 259 (Nov. 2011), 226 (Dec. 2011), 248 (Jan. 2012), 336 (Feb. 2012), 302 (July 2012), 286 (Dec. 2012), 387 (Apr. 2013), 913 (Jan. 2015), 1002 (May 2015)), he claimed that his medications made him depressed and gave him "brain fog," which meant that he "c[ouldn't] do crap" or concentrate (AR 54-55). The brain fog was constant, he noted. (AR 54.)

He stated that he used the computer to check Facebook, as he had "family back east" and "they post[ed] pictures." (AR 55.) He testified to using Facebook or the computer for "[o]ne to two hours a day max." (Id.) He also stated that he would read "20 pages" of a book and "then forget" what he read; he had "a couple of friends" but saw them "maybe once a year"; and he went to the grocery store "[o]nce every two weeks." (AR 56.)

### 3. Analysis

Having reviewed the record in detail, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce his alleged symptoms but that his "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible." (AR 35.) She gave at least three clear and convincing reasons supported by substantial evidence for doing so: (1) "multiple reports" indicated that Plaintiff was "medical[ly]

noncomplian[t]" with prescribed treatment; (2) Plaintiff's "activities" were inconsistent with the "allegation he could not perform even light work"; and (3) Plaintiff "indicate[d] he was working after the alleged onset date." (AR 34-35)

The ALJ also found that Plaintiff's mental impairments did not cause more than "minimal limitation in [his] ability to perform basic mental work activities" and were "not severe." (AR 29.) Plaintiff has not challenged that finding on appeal.

a. *Medical noncompliance*

An "unexplained, or inadequately explained, failure to . . . follow a prescribed course of treatment" is a clear and convincing reason for discounting the credibility of a claimant's subjective symptom statements. <u>Bunnell v. Sullivan</u>, 947 F.2d 341, 346-47 (9th Cir. 1991) (en banc). The ALJ here identified several instances of Plaintiff's failure to follow treatment, including "failing to take prescribed medication" and "cancelling multiple medical appointments." (<u>See</u> AR 34.)

Plaintiff contends that those reasons were inaccurate because he in fact "underwent several sessions of psychotherapy not only with Dr. Gonzalez at the VA but with Dr. La Fleur at an outside clinic." (J. Stip. at 9-10 (citing AR 237-44, 334, 324-25, 322, 226-30).) And although he did eventually discontinue therapy, he argues, he "continued to adhere to his prescribed medication regimen." (<u>Id.</u> at 10 (citing AR 269, 265, 259, 305, 287, 913).) Plaintiff alleges that the ALJ did not explain why his adherence to "medication and follow-up psychiatric visits" was "intrinsically at odds with his claim of disability." (<u>Id.</u>)

Plaintiff overstates his alleged "adherence" to treatment,

26

however. Though the record reflects that Plaintiff generally complied with his medications (see, e.g., AR 248 (Jan. 2012), 336 (Feb. 2012), 302 (July 2012), 286 (Dec. 2012), 387 (Apr. 2013), 617 (June 2014), 913 (Jan. 2015), 1002 (May 2015)), the ALJ correctly stated that there were "multiple reports" in which Plaintiff failed to do so (AR 34).

For example, Plaintiff was noted in September 2013 to be noncompliant with his sertraline prescription despite reporting that he was taking his medications. (AR 649.) At that time, Dr. Choi noted that Plaintiff was denied unemployment benefits, which "made his mood and health worse." (AR 646.) Similarly, in March 2014, complaining of "frustration" over not getting Social Security benefits "[n]o matter what [he tried]," Plaintiff "missed about 3 months of sertraline." (AR 635, 639.) After Plaintiff's mood improved in May 2014 upon receiving Social Security (see AR 621), he was noted as becoming compliant with medication again (see AR 617, 913, 1002). Such inadequately explained failure to take prescribed medications constitutes a clear and convincing reason for discounting Plaintiff's testimony. See Lancaster v. Colvin, No. ED CV 14-1639-PJW, 2016 WL 1252751, at *2 (C.D. Cal. Mar. 28, 2016) (upholding ALJ's adverse credibility determination in part because "on balance on [the] record" before him and despite plaintiff's "psychiatric impairments," "the ALJ was not wrong for considering [p]laintiff's [unexplained] failure to take her medications").[15]

---

[15] Though the Court does "not punish the mentally ill for occasionally going off their medication when the record affords compelling reason to view such departures from prescribed

Further, to the extent Plaintiff contends he was compliant with his psychotherapy treatment, the record reflects, as noted by the ALJ, that he inexplicably canceled sessions with Dr. Choi and Dr. Gonzalez on several occasions. (See AR 323 (not appearing for Apr. 2012 appointment with Dr. Gonzalez), 236 (canceling May 2012 appointment with Dr. Choi), 314 (canceling July 2012 appointment with Dr. Gonzalez and failing to return messages to reschedule), 648 (canceling 2013 appointments with Dr. Choi), 650 (canceling Jan. 2014 appointment with Dr. Choi), 621 (not appearing for May 2014 appointment with Dr. Choi).) And when Plaintiff explained at least one of his absences in 2014, it was because he "got his Social Security" and was "no longer" depressed. (AR 621.) Thus, substantial evidence supports the ALJ's finding that the severity of Plaintiff's allegations was undermined by his repeated failure to comply with treatment. See

treatment as part of claimants' underlying mental afflictions," see Garrison v. Colvin, 759 F.3d 995, 1018 n.24 (9th Cir. 2014); see also Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996), the record here provides no such "compelling" basis to excuse Plaintiff's noncompliance, nor has he alleged as much. In fact, the record demonstrates that Plaintiff was more than capable of consistently taking his prescribed medications and failed to do so only when he was denied unemployment and Social Security benefits. See Presley-Carrillo v. Berryhill, 692 F. App'x 941, 945 (9th Cir. 2017) (upholding ALJ's reliance on plaintiff's "noncompliance in taking prescribed medications" because plaintiff "[did] not point to any evidence in the record demonstrating that her mental health impairments caused that noncompliance" and "[t]he record demonstrate[d] that in the year leading up to the hearing before the ALJ, [plaintiff] was capable of consistently taking her prescribed medications"). Indeed, as discussed elsewhere, Plaintiff's occasional failures to comply with his medication regimens could not have been caused by "underlying mental afflictions" because the ALJ found that Plaintiff's mental impairments caused no more than "minimal limitation" and were not severe, findings Plaintiff has not challenged.

<u>Judge v. Astrue</u>, No. CV 09-4743-PJW, 2010 WL 3245813, at *4 (C.D. Cal. Aug. 16, 2010) ("[The claimant's] failure to get treatment after 1997 seems more a function of the fact that she did not need it, as opposed to her inability to comprehend that she needed it.").[16]

Plaintiff does not dispute his failure to cease alcohol and marijuana abuse (<u>see generally</u> J. Stip. at 8-12), and this too was a clear and convincing reason to discount his testimony and was supported by substantial evidence. <u>See Deck v. Colvin</u>, 588 F. App'x 747, 748 (9th Cir. 2014) (ALJ properly discounted plaintiff's credibility in part because of "her continued drug use"); <u>see also</u> <u>Gopher v. Comm'r of Soc. Sec.</u>, __ F. Supp. 3d __, No. 1:16-cv-03100-MKD, 2017 WL 5135360, at *14 (E.D. Wash. Sept. 25, 2017) (finding that ALJ gave "clear and convincing reason to discredit [plaintiff's] symptom testimony" for "unexplained failure to follow treatment" in part because she failed to

---

[16] Though neither party has raised the issue, it is sometimes "questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." <u>Nguyen v. Chater</u>, 100 F.3d 1462, 1465 (9th Cir. 1996) (citation omitted); <u>see also</u> <u>Rosas v. Colvin</u>, No. CV 13-2756-SP, 2014 WL 3736531, at *11 (C.D. Cal. July 28, 2014) (finding that failure to attend therapy sessions was "not necessarily a clear and convincing reason to discount [a claimant's] testimony"). <u>Nguyen</u>, however, is distinguishable. It dealt with an ALJ who discredited a psychologist's diagnosis of depression based on lack of a treatment record, whereas here the ALJ relied on Plaintiff's frequent appointment cancellations and other treatment failures to discredit the severity of his alleged symptoms. Moreover, Plaintiff has not challenged the ALJ's step-two finding that none of his alleged mental-health impairments caused more than "minimal limitation" or were "severe" (AR 29), and thus they could not have caused his treatment failures.

"follow even minimal mental health treatment").[17]

On numerous occasions, Plaintiff was told by treating psychiatrist Dr. Choi to "stop," "cease," or "abstain" from using alcohol and marijuana. (See, e.g., AR 269 (Mar. 2011), 452 (Feb. 2012), 305 (July 2012), 298 (Sept. 2012), 287 (Dec. 2012), 389 (Apr. 2013), 649 (Sept. 2013), 640 (Mar. 2014), 621 (June 2014), 917 (Jan. 2015), 1006 (May 2015).) But Plaintiff failed to do so and continued to use both substances. (See, e.g., AR 267 (May 2011), 262 (Oct. 2011), 248 (Jan. 2012), 327-28 (Mar. 2012), 301 (July 2012), 295 (Sept. 2012), 284 (Dec. 2012), 387 (Apr. 2013), 599 (same), 646 (Sept. 2013), 636 (Mar. 2014), 617 (June 2014), 913 (Jan. 2015), 903 (Mar. 2015), 50 (June 2015).)

Though at times he reported that he "cut back" on his alcohol consumption (see, e.g., AR 262 (Oct. 2011), 248 (Jan. 2012), 646 (Sept. 2013), 636 (Mar. 2014), 617 (June 2014), 913 (Jan. 2015)) and at one point denied alcohol use entirely (AR 336 (Feb. 2012)), such statements were belied by the record (see,

---

[17] Though an ALJ must usually determine whether a claimant's alcoholism and drug abuse are contributing factors to any mental impairment, see 20 C.F.R. § 404.1535; SSR 13-2P, 2013 WL 621536 (Feb. 20, 2013), such an evaluation is not necessary when the ALJ finds a mental impairment "not severe in the first place." Bustamante v. Massanari, 262 F.3d 949, 954 (9th Cir. 2001); see also Ball v. Massanari, 254 F.3d 817, 823 (9th Cir. 2001) ("[A]n ALJ must conduct a 'differentiating' analysis to separate the alcoholism and drug-related impairments from the unrelated . . . impairments only if the record indicates that the non-substance-abuse-related impairments are 'severe' and therefore pass step 2 of the sequential evaluation process. It follows that if the claimant's ailment does not pass step 2, ipso facto it is not disabling."). The ALJ here found Plaintiff's mental impairments not severe, a finding he has not challenged, and thus the ALJ did not err by failing to conduct a § 404.1535 analysis. (See AR 29.) But any "brain fog" may well have been caused by Plaintiff's ongoing and at times heavy substance abuse.

e.g., AR 228 (Dec. 2011: two ounces of scotch 30 times a month), 238 (Jan. 2012: one to two ounces a day but last drink was two months prior), 327-28 (Mar. 2012: "1 drink" a day), 301 (July 2012: ounce a day), 599 (Apr. 2013: "1-2 drinks of alcohol per day"), 646 (Sept. 2013: "3 [ounces] of whiskey a week"), 636 (Mar. 2014: "3 [ounces of] whiskey per week"), 617 (June 2014: "a few drinks a week"), 903 (Mar. 2015: "1-2 drinks" three times a week), 50 (June 2015: "3 ounces a week")).

Similarly, Plaintiff's occasional reports of smoking "less" marijuana were inconsistent with records demonstrating a fairly sustained marijuana habit. (See, e.g., AR 267 (May 2011: "a couple of times a month"), 262 (Oct 2011: "one joint over a couple of weeks"), 248 (Jan 2012: "2 joints" a week), 238 (Jan. 2012: three to four times a week), 301 (July 2012: "3 days a week, one joint per week"), 295 (Sept 2012: "1 joint per three days" but had stopped two weeks prior), 284 (Dec. 2012: "twice a week"), 387 (Apr. 2013: stopped since Dec. 2012), 636 (Mar. 2014: "1-2 [marijuana] joints per month"), 617 (June 2014: "1-2 joints per month"), 913 (Jan. 2015: "one joint in the last couple of months").)

Moreover, as the ALJ explained, Plaintiff not only continued alcohol and marijuana use but frequently "stated that he did not want to cease his substance abuse" and "refused substance abuse treatment" without explanation, both before and during the relevant period. (AR 34; see also AR 269 (May 2011), 334 (Mar. 2012), 284 (Dec. 2012), 341 (Feb. 2013), 621 (June 2014), 913 (Jan. 2015).) Substantial evidence therefore supports the ALJ's adverse credibility determination based on the clear and

31

convincing reason that Plaintiff failed to follow his prescribed substance-abuse treatment.  See Hall v. Colvin, No. 1:12-CV-00347-REB, 2013 WL 4776463, at *6 (D. Idaho Sept. 4, 2013) (finding that ALJ properly rejected claimant's testimony because "he continued to engage in binge drinking and marijuana use after being repeatedly counseled to abstain from all alcohol and drug consumption"); Wodtli v. Astrue, No. C-05-03921 RMW, 2008 WL 4104216, at *6 (N.D. Cal. Sept. 2, 2008) (finding that ALJ properly rejected plaintiff's "testimony that she could not do other work" in part because she "still drank despite having been told by her doctors to stop drinking").

b.  *Inconsistency with daily activities*

The ALJ also correctly found that Plaintiff's "activity level undermined" the credibility of his symptom testimony because his daily activities were "not consistent with the allegation [that] he could not perform even light work."  (AR 34-35.)  An ALJ may properly discount the credibility of a plaintiff's subjective symptom statements when they are inconsistent with his daily activities.  See Molina, 674 F.3d at 1112.  "Even where those [daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."  Id. at 1113.

Plaintiff reported that he could not work because of "his inability to get along with people, loss of motivation, depressed moods, and anxiety build-up" (AR 226) and alleged that his impairments prevented him from getting along with family members and others, concentrating, or paying attention (AR 178-79; see

also AR 54-55 (testifying that his medications made him depressed and gave him "brain fog," during which he couldn't do anything or concentrate)). But as the ALJ explained, those purported limitations were contradicted by his daily activities.

To the extent he alleged an "inability to get along with people," the record demonstrates that Plaintiff regularly shopped in stores, attended medical appointments, and ran errands (AR 56, 176, 181-83); went to the movies and interacted with people on Facebook (AR 55, 185); and had friends whom he would see "maybe once a year" (AR 56, 239). He had a "good rapport" with Dr. Choi (AR 1004) and frequently reported having a "good relationship" with his wife, brother, and sons (see AR 226-27, 238-39, 301, 646 (enjoying and feeling "fantastic" during "a visit back East"), 913 (enjoying out-of-town visit with two of his sons "before the holidays," involving "long drive")). Such reported activities were inconsistent with Plaintiff's claims of inability to get along with others. See Womeldorf v. Berryhill, 685 F. App'x 620, 621 (9th Cir. 2017) (upholding ALJ's discounting of plaintiff's credibility in part because his activities of daily living "were not entirely consistent with his claimed inability to engage in social interactions").

To the extent his symptom statements focused on his lack of motivation and inability to concentrate or pay attention, the ALJ highlighted that Plaintiff took care of his dog and completed other productive household work: "do[ing] the laundry," shopping in person, making "light meals," "wash[ing] dishes," and "water[ing] the plants." (AR 34-35.) Those activities were substantiated by the record (see AR 55-56, 174-76, 181-83, 185),

which further demonstrated that Plaintiff walked his dog, played fetch with him, and felt "good" or "great" while doing so (AR 263, 284, 295); gardened (AR 48, 617); "work[ed] on Dutch furniture" (AR 617); played golf (AR 295); wanted to travel and did travel out of state and across the country (AR 262-63, 617, 646, 913); and could frequently use the computer and read the news (AR 55, 174, 181, 263). Moreover, Dr. Choi, Plaintiff's own longtime treating psychiatrist, opined that Plaintiff had "no limits on his activities" because of his alleged disabilities (AR 342), and Plaintiff independently reported to another physician that he cooked, cleaned, drove, shopped, and "perform[ed] his own activities of daily living without assistance" (AR 599). Accordingly, Plaintiff's reported daily activities were inconsistent with allegations that he was unable to work because he lacked both motivation and the ability to concentrate or pay attention.

### c. *Working after alleged disability-onset date*

The ALJ found that Plaintiff's reports of working after the alleged disability-onset date undermined the credibility of his subjective symptom statements. (AR 34.) An ALJ may consider work history when evaluating a claimant's credibility. <u>See</u> <u>Thomas</u>, 278 F.3d at 958-59. And the fact that a claimant has worked after his alleged onset date may constitute a clear and convincing reason for "finding [the] claimant not fully credible." <u>See</u> <u>Gartzke v. Colvin</u>, 129 F. Supp. 3d 1040, 1049-50 (D. Or. 2015); <u>see also</u> <u>Lenex v. Colvin</u>, No. 1:15-cv-00581-BAM, 2016 WL 5404437, at *6 (E.D. Cal. Sept. 27, 2016).

Plaintiff argues that the evidence supporting the ALJ's

reasoning is based on only a small discrepancy. (J. Stip. at 10-11.) As he explains, the ALJ specified that Plaintiff reported in October 2011 that he was "laid off 'three months ago.'" (AR 34; see also AR 262.) This created "an approximately six-week discrepancy" between the time specified and the alleged onset date of May 26, 2011; this discrepancy, Plaintiff contends, was "inconsequential" and "minor." (J. Stip. at 11.)

The record, however, supports the ALJ's inference that this was not an inconsequential discrepancy and that Plaintiff was indeed working after May 2011. Not only did Plaintiff report working up until he was "laid off" three months before October 2011 (AR 262), but he also reported to Dr. Choi that he was working "50-60 hours a [week]" as of May 26, 2011, the alleged disability-onset date (AR 267). Clearly, then, as of the alleged onset date Plaintiff was still capable of working full time. Moreover, he stated to Dr. Gonzalez in January 2012 that he lost his last job in June 2011. (AR 238.)[18] Substantial evidence therefore supports the inference that Plaintiff was working after the alleged onset date, as the ALJ found. See Holzberg v. Astrue, 679 F. Supp. 2d 1249, 1262 (W.D. Wash. 2010) (ALJ properly discounted credibility when "plaintiff apparently was able to work and care for another during times when she was experiencing the same or substantially similar symptoms she now claims are disabling" (citing Smolen, 80 F.3d at 1284)); Archuleta v. Colvin, No. CV 12-04486-MAN, 2013 WL

---

[18] Further, Plaintiff's statement that he was "laid off" (AR 262) belies his claims elsewhere in the record that he was "fired" for poor work performance (AR 49).

6002096, at *9 (C.D. Cal. Nov. 8, 2013) ("[P]laintiff's ability to work after the alleged onset date [gave] rise to a reasonable inference that plaintiff's subjective pain [was] not as restrictive as she allege[d] it to be.").

    d.  *Other reasons*

Plaintiff identifies three additional reasons offered by the ALJ to discount the credibility of his symptom statements: he was collecting unemployment (J. Stip. at 10), his depression was "situational" (<u>id.</u> at 9), and he was assessed a GAF score of "61-70" (<u>id.</u> at 8-9). Plaintiff argues that each of those reasons was inadequate. (<u>See</u> <u>id.</u> at 8-10.)

While "[c]ontinued receipt of unemployment benefits does cast doubt on a claim of disability," <u>Ghanim v. Colvin</u>, 763 F.3d 1154, 1165 (9th Cir. 2014) (citing <u>Copeland v. Bowen</u>, 861 F.2d 536, 542 (9th Cir. 1988)), "a claimant's receipt of unemployment benefits does not necessarily constitute a legally sufficient reason for an adverse credibility determination when the record 'does not establish whether [the claimant] held himself out as available for full-time or part-time work,'" <u>Lind v. Colvin</u>, No. EDCV 14-1474 RNB, 2015 WL 1863313, at *3 (C.D. Cal. Apr. 23, 2015) (alteration in original) (quoting <u>Carmickle v. Comm'r, Soc. Sec. Admin.</u>, 533 F.3d 1155, 1161-62 (9th Cir. 2008)); <u>see also</u> <u>Mulanax v. Comm'r of Soc. Sec.</u>, 293 F. App'x 522, 523 (9th Cir. 2008) (unemployment benefits for part-time work not necessarily inconsistent with claim for Social Security disability). The record here does not indicate how or under what circumstances Plaintiff received his unemployment benefits, including whether it was for full-time or part-time work. (<u>See, e.g.</u>, AR 238-39

(discussing with Dr. Gonzalez only "collecting unemployment" and that benefits would run out by end of 2012).)  Thus, without more, the ALJ's reliance on Plaintiff's apparent receipt of unemployment benefits was neither a clear nor convincing reason for discounting his statements' credibility.  See Benjamin v. Colvin, No. Ed CV 13-2343-E, 2014 WL 4437288, at *3 (C.D. Cal. Sept. 9, 2014) ("In this case, there is no indication whether Plaintiff based her claim for unemployment benefits on full-time or part-time work[, and] therefore, the fact that Plaintiff may have claimed to be able to do some work does not support the ALJ's adverse credibility determination.").

Further, while the ALJ may have properly discounted Plaintiff's credibility given his situational depression, see Chesler v. Colvin, 649 F. App'x 631, 632 (9th Cir. 2016) (symptom testimony properly rejected in part because "the record support[ed] the ALJ's conclusion that [plaintiff's] mental health symptoms were situational"),[19] and relatively high GAF scores,

---

[19] Indeed, Plaintiff's depression clearly was situational. (See, e.g., AR 262 ("feeling a little better" without stress of work), 284 (feeling better after increase in VA disability rating), 646 ("mood and health worse[ning]" when he was denied unemployment benefits but feeling "fantastic" during "a visit back East"), 635 (reporting "frustration" and "anxiety" trying to get Social Security benefits), 621 (reporting that he was "no longer . . . depressed" and "doing 'much, much better'" after "he got his Social Security"), 617 (reporting that "[a]s soon as the Social Security was approved, he instantly felt his mood improved"), 912 ("doing great" after receiving 100 percent disability rating from VA); see also AR 342 (Dr. Choi stating that Plaintiff's condition depended on "situational stressors")); Menchaca v. Comm'r, Soc. Sec. Admin., No. 6:15-cv-01470-HZ, 2016 WL 8677320, at *7 (D. Or. Oct. 7, 2016) (symptoms caused by "situational stressors" is "legitimate reason to discount . . . credibility").  But see Bryant v. Astrue, No. C12-5040-RSM-JPD, 2012 WL 5293018, at *5-7 (W.D. Wash. Sept. 24, 2012) (finding

37

see <u>Boyd v. Colvin</u>, 524 F. App'x 334, 337 (9th Cir. 2013)
(upholding ALJ's reliance on GAF scores to discredit plaintiff's
contrary testimony),[20] Defendant has not raised any such
argument, nor has she disputed Plaintiff's contentions on these
grounds.  (<u>See generally</u> J. Stip. at 12-17.)

Even if the ALJ erred, however, she provided other clear and
convincing reasons for her adverse credibility assessment and
thus any error was harmless.  <u>See</u> <u>Larkins v. Colvin</u>, 674 F. App'x
632, 633 (9th Cir. 2017) (citing <u>Batson v. Comm'r of Soc. Sec.
Admin.</u>, 359 F.3d 1190, 1197 (9th Cir. 2004)).  Remand is
therefore unwarranted.

B.   <u>The ALJ Properly Evaluated the VA Decision</u>

Plaintiff argues that "[t]he ALJ's two stated rationales for
entirely rejecting the Department of Veterans Affairs' disability
determination out of hand are patently inadequate." (J. Stip. at
5.)  He alleges that the ALJ made the "false assertion" that the
VA's decision "did not include any discussion of the medical
findings on which the diagnosis or finding of disability was
based." (<u>Id.</u> (citing AR 33).)  Moreover, he alleges that the ALJ
made the inadequate "general assertion" that "the VA and Social

mental-health symptoms exacerbated by "situational stressors"
"not clear and convincing reason to discount plaintiff's
credibility"), <u>accepted by</u> 2012 WL 5293016 (W.D. Wash. Oct. 26,
2012).

[20] Plaintiff argues that the ALJ improperly ignored Dr.
Gonzalez's GAF scores of 59 and focused only on Dr. Choi's
consistently mild scores.  (J. Stip. at 8-9.)  But Dr. Gonzalez
saw Plaintiff only a few times over a five-month period (<u>see,
e.g.</u>, AR 237-44, 312-14), whereas Dr. Choi treated Plaintiff for
at least six years on multiple occasions (<u>see, e.g.</u>, AR 266-69,
1002-06).

Security utilize different programs with different criteria for disability." (Id. at 6 (citing AR 33).) In fact, the ALJ provided a legally adequate reason for rejecting the VA disability determination.

1. Applicable law

Disability determinations made by the Department of Veterans Affairs are not binding on an ALJ. See § 404.1504;[21] McCartey v. Massanari, 298 F.3d 1072, 1076 (9th Cir. 2002) (holding that "a VA rating of disability does not necessarily compel the SSA to reach an identical result" (citing § 404.1504)). ALJs must consider VA disability findings in their decisions, however, McLeod v. Astrue, 640 F.3d 881, 886 (9th Cir. 2011) (as amended), and "must ordinarily give [them] great weight," McCartey, 298 F.3d at 1076. That is because of the "marked similarity between these two federal disability programs." Id. But because "VA and SSA criteria for determining disability are not identical," a VA disability rating is not dispositive. Id. The ALJ need provide only "persuasive, specific, valid reasons" that are "supported by

_____

[21] Social Security regulations regarding the decisions of other agencies were amended effective March 27, 2017. When, as here, the ALJ's decision is the final decision of the Commissioner, the reviewing court generally applies the law in effect at the time of the ALJ's decision. See Lowry v. Astrue, 474 F. App'x 801, 804 n.2 (2d Cir. 2012) (applying version of regulation in effect at time of ALJ's decision despite subsequent amendment); Garrett ex rel. Moore v. Barnhart, 366 F.3d 643, 647 (8th Cir. 2004) ("We apply the rules that were in effect at the time the Commissioner's decision became final."); Spencer v. Colvin, No. 3:15-CV-05925-DWC, 2016 WL 7046848, at *9 n.4 (W.D. Wash. Dec. 1, 2016) ("42 U.S.C. § 405 does not contain any express authorization from Congress allowing the Commissioner to engage in retroactive rulemaking."). Accordingly, citations to 20 C.F.R. § 404.1504 are to the version in effect until March 26, 2017.

the record" for rejecting a VA disability finding. <u>Id.</u>; <u>accord</u>
<u>Berry</u>, 622 F.3d at 1236; <u>Valentine v. Comm'r Soc. Sec. Admin.</u>,
574 F.3d 685, 695 (9th Cir. 2009); <u>Underhill v. Berryhill</u>, 685 F.
App'x 522, 522 (9th Cir. 2017).

2.  <u>Additional relevant background</u>

On November 2, 2012, the VA issued Plaintiff a disability
rating of 70 percent for his major depressive disorder (AR 276),
60 percent for his coronary artery disease (<u>id.</u>), and 20 percent
for his diabetes mellitus (AR 272).  The individual percentages
were combined nonadditively using a "rating table," and he was
given an overall disability rating of 90 percent.  (AR 277.)

The VA cited nine evidentiary sources for its decision,
including Plaintiff's treatment records from June 2010 to
November 2011 at the VA Medical Center in West Los Angeles, the
December 9, 2011 medical opinion of Dr. La Fleur regarding his
mental health, and the December 9 and December 21, 2011 medical
opinions of Dr. Kristopher Howalt regarding his heart health and
diabetes mellitus.[22]  (AR 275.)

In making its depressive-disorder rating, the VA listed
findings that Plaintiff had a GAF score of 65, difficulty
adapting to a worklife setting, difficulty in adapting to
stressful circumstances, difficulty in adapting to work,
occupational and social impairments with reduced reliability and
productivity, difficulty in establishing and maintaining
effective work and social relationships, anxiety, chronic sleep
impairment, and a depressed mood.  (AR 276.)  In making its

_____

[22] The record does not contain the opinions or treatment
notes of Dr. Howalt.

40

coronary-artery-disease rating, the VA relied on an assessment that Plaintiff could handle "[w]orkload[s] of greater than three METs[23] but not greater than five METs," which "results in dyspnea, fatigue, angina, dizziness, or syncope." (Id.) Plaintiff was also noted as having a left ventricular ejection fraction of 65 percent. (AR 272.) In making its diabetes rating, the VA noted Plaintiff's need for an oral hypoglycemic agent and regulation of his activities. (Id.) His related erectile dysfunction was noted as noncompensable. (Id.)

### 3. Analysis

The ALJ found the VA disability determination "not persuasive[] because it [was] not supported by the medical evidence." (AR 33.) She specified that the VA decision "did not include any discussion of the medical findings on which the diagnosis or finding of disability was based," and "[t]he [VA] standard of disability also differ[ed] from the Social Security regulations." (Id.)

Plaintiff takes issue with the ALJ's two rationales and correctly argues that the latter "is not a 'persuasive, specific, valid reason[]' for discounting the VA determination." Berry, 622 F.3d at 1236 (quoting Valentine, 574 F.3d at 695); see Underhill, 685 F. App'x at 522 ("The first reason given by the ALJ — that the rating system used by the VA is not the same as

---

[23] "One metabolic equivalent (MET) is defined as the amount of oxygen consumed while sitting at rest."  M. Jetté et al., Metabolic Equivalents (METS) in Exercise Testing, Exercise Prescription, and Evaluation of Functional Capacity, 13 Clinical Cardiology 555, 555 (1990), https://www.ncbi.nlm.nih.gov/pubmed/2204507.

the one used by the Social Security Administration — is not
valid."). As explained in <u>Valentine</u>, "[i]nsofar as the ALJ
distinguished the VA's disability rating on the general ground
that VA and SSA disability inquiries are different, her analysis
fell afoul of <u>McCartey</u>." 574 F.3d at 695. Thus, the ALJ's
rejection of the VA decision on that ground was improper.[24]

But the ALJ properly found that the VA decision provided no
discussion of the medical findings upon which it was based. <u>See</u>
<u>Nault v. Colvin</u>, 593 F. App'x 722, 723 (9th Cir. 2015) (ALJ
properly rejected VA disability determination that did not
explain "how it was determined"); <u>cf.</u> <u>Thomas</u>, 278 F.3d at 957
(ALJ need not accept medical opinion that is "brief, conclusory,
and inadequately supported by clinical findings"). This was
particularly critical given that the ALJ rejected some of those
underlying findings elsewhere in her decision. <u>See</u> <u>Shattuck v.</u>
<u>Berryhill</u>, No. 1:16-cv-01654-MC, 2017 WL 5490868, at *6-7 (D. Or.
Nov. 15, 2017) ("[T]he ALJ incorporated his rejection of the
opinions of [several physicians] and his unchallenged negative
credibility finding with regard to Plaintiff's subjective symptom
testimony[ and thus] gave sufficient, valid reasons for assigning
reduced weight to the VA's determination of disability.");
<u>Orsborn v. Astrue</u>, No. CV 12-13-M-DLC, 2012 WL 6018043, at *2 (D.
Mont. Dec. 3, 2012) (finding that ALJ "adequately considered and
rejected [VA] rating" because he identified inconsistencies in
"VA's own medical evidence" and discounted plaintiff's underlying

---

[24] Of course, the ALJ may simply have been noting the
difference between the two programs rather than relying on that
difference to reject the VA's disability rating.

"self-reports [as] less than credible"). Indeed, Plaintiff fails
to even mention the ALJ's conclusion that the VA decision "[was]
not supported by the medical evidence." (AR 33); see Cassel v.
Berryhill, 706 F. App'x 430, 432 (9th Cir. 2017) ("[T]he ALJ
properly rejected the VA rating based on inconsistency with other
medical records that did not support a finding of 100%
disability.").

The VA's 70-percent disability rating for depression seemed
to rely heavily on the opinion of Dr. La Fleur, as it repeated —
without discussion — many of the symptoms and findings she
provided in her December 2011 medical-source statement. (Compare
AR 276, with AR 226-30.) Dr. La Fleur's opinion was discounted
by the ALJ because her disability conclusion "equivocat[ed]" and
was unsupported by the "mild mental health findings upon
examination." (AR 33-34; see also AR 228 (Dr. La Fleur finding
that Plaintiff was oriented "within normal limits"; had
"appropriate" appearance, hygiene, behavior, and thought
processes; was able to understand directions; did not have
slowness of thought; did not appear confused; and had normal
judgment and abstract thinking).) Plaintiff has not challenged
the ALJ's rejection of Dr. La Fleur's opinion. Moreover, the
opinion and treatment records of Plaintiff's longtime treating
physician, Dr. Choi, further undermined the VA disability
decision by indicating that Plaintiff faced "no limits on his
activities" because of his alleged mental impairments. (See,
e.g., AR 342.) Accordingly, the ALJ properly rejected the VA's
depression-related disability rating because it was unsupported
by substantial evidence in the record. See Mason v. Colvin, No.

13-cv-05724 JRC, 2014 WL 2589483, at *4 (W.D. Wash. June 10, 2014) (finding ALJ's rejection of VA disability determination proper because it was "based on substantial evidence in the record as a whole").

The VA's disability ratings as to Plaintiff's coronary artery disease and diabetes were similarly undermined by the medical record, the relevant portions of which the ALJ discussed in detail. (See AR 35.) For example, Plaintiff was examined in April 2013 by internist Roger Wagner. (AR 598-602.) Dr. Wagner assessed him with coronary artery disease and diabetes but found that he faced "[n]o limitations" in his capacity to stand, walk, or sit or in his ability to engage in postural, manipulative, or "[w]orkplace environmental" activities. (AR 601-02.) Dr. Wagner also assessed that he could lift and carry "50 pounds occasionally and 25 pounds frequently." (AR 602.) Again, Plaintiff has not challenged the ALJ's reliance on Dr. Wagner's opinion. (See AR 35.) And his opinion was corroborated by the opinions of state-agency consultants who, upon reviewing Plaintiff's medical records, found that he had no severe physical limitations. (AR 68, 86.) Substantial evidence therefore contradicted the medical findings of greater disability relied on by the VA, supporting the ALJ's rejection of the VA disability ratings altogether. See Hicks v. Astrue, No. CIV S-11-0148 GGH, 2012 WL 3728012, at *5 (E.D. Cal. Aug. 24, 2012) (holding that ALJ "did not err by assigning the VA disability finding less weight" because ALJ's decision was supported by record and he "had more recent evidence before him that was not available to the VA"). Remand is therefore unwarranted on this ground.

44

## VI. CONCLUSION

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[25] IT IS ORDERED that judgment be entered AFFIRMING the Commissioner's decision, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice.


DATED: January 19, 2018  _____

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[25] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."